# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| SHAUN JENKINS,<br>　　　　　Plaintiff,<br><br>v.<br><br>CITY OF BOSTON; and DANIEL KEELER, DENNIS HARRIS, KEVIN MCGOLDRICK, PAUL SCHROEDER, and PAUL FARRAHAR *in their individual capacities*,<br>　　　　　Defendants. | Civil Action No. 23-cv-11299 |

## COMPLAINT AND JURY DEMAND

Plaintiff Shaun Jenkins, by and through his attorneys, the law firms: Neufeld Scheck & Brustin, LLP, and Zalkind Duncan & Bernstein LLP, alleges as follows:

1. Plaintiff Shaun Jenkins was incarcerated for almost 19 years for a crime he did not commit—the December 2001 fatal shooting of his cousin, Stephen Jenkins, in Dorchester.[1]

2. Shaun has always maintained his innocence of the shooting, no physical or forensic evidence ever connected him to the crime, and no witness even placed Shaun in Dorchester that night (he lived in Fall River). Although there were no witnesses to the shooting, an eyewitness saw a passenger in the car with Stephen moments before he was shot—and that passenger looked nothing like Shaun.

---

[1] Because Shaun and Stephen share a last name, they are referred to throughout the complaint by their first names.

3.   Shaun was nevertheless wrongly convicted based on evidence fabricated by Boston Police
Department ("BPD") Detectives, principally, false statements from two witnesses
implicating him. But the jury never learned of critical evidence impeaching their
testimony—including that both witnesses had received cash payments from the police and
had been pressured to provide testimony. Both subsequently disclaimed their testimony
implicating Shaun.

4.   Most significantly, the jury never learned of substantial evidence pointing to the real
perpetrator of the shooting: a drug dealer, Mike White, who lived less than two blocks from
where the shooting happened, and to whom Stephen owed thousands of dollars when he
was killed. This undisclosed evidence included cell phone records demonstrating that
Stephen had called his dealer, White, five times the day he was murdered, including a call
only 20 minutes before Stephen was shot. BPD Detectives hid this exculpatory information
from the cell phone records from the prosecution and misrepresented to them that their
investigation revealed that White was not involved in Stephen's death.

5.   The individual Defendants' actions in Shaun's case were the direct result of the conduct of
BPD supervisors and policymakers who prioritized clearing cases above all else and who
tolerated or condoned the use of unconstitutional techniques to reach that end. Indeed, the
individual Defendants' actions were the foreseeable consequence of a culture within the
BPD of endorsing serious constitutional violations through the inadequate supervision and
discipline of its members, including its detectives. The BPD's lawless culture further
resulted in a pattern, practice, and/or custom of deliberately fabricating and coercing
evidence as well as withholding exculpatory evidence.

6.    In December 2021, a Massachusetts Superior Court held that BPD's unlawful tactics had deprived Shaun of a fair trial. The Court vacated Shaun's conviction because the suppression of exculpatory evidence "seriously tainted" the trial and amounted to egregious misconduct.

7.    As a direct result of Defendants' misconduct, Shaun was incarcerated for nearly nineteen years and suffered injuries and damages, including but not limited to: pain and suffering, severe mental anguish, emotional distress, physical illness, inadequate medical care, humiliation, injury to reputation, permanent psychological damage, and restrictions on all forms of personal freedom including but not limited to diet, sleep, personal contact, educational opportunity, personal fulfillment, family relations, travel, enjoyment, and expression. This suit seeks to hold Defendants accountable for the misconduct which led to these injuries.

**JURISDICTION AND VENUE**

8.    This action is brought pursuant to 42 U.S.C. § 1983 to redress the deprivation under color of law of Plaintiff's rights as secured by the United States Constitution.

9.    This Court has federal question jurisdiction pursuant to 28 U.S.C. §§ 1331, 1343, and 1367.

10.   Venue is proper in the District of Massachusetts under U.S.C. § 1391(b), because this is the District in which the claim arose.

11.   Plaintiff respectfully demands a trial by jury on all issues and claims set forth in this Complaint, pursuant to the Seventh Amendment of the United States Constitution and Fed. R. Civ. P. 38(b).

12.   Plaintiff has complied with the requirements of the Massachusetts Tort Claims Act, Mass. Gen. Laws ch. 258 § 1, et. seq. Plaintiff served the City of Boston and Boston Police

Department, with presentment letters dated July 8, 2022. As of the date of this filing, Plaintiff has not received any substantive response from the City of Boston, Boston Police Department.

**PARTIES**

13.  Plaintiff Shaun Jenkins is forty-five years old and lives in Massachusetts. Shaun was wrongfully incarcerated by the Commonwealth of Massachusetts from his arraignment on December 26, 2002, until his release on September 24, 2021.

14.  At all relevant times, Defendant Daniel Keeler was employed as a detective by the BPD, acting under color of law and in his individual capacity within the scope of employment pursuant to the statutes, ordinances, regulations, policies, customs, and usage of the City of Boston and the Commonwealth of Massachusetts. Upon information and belief, he is entitled to indemnification under statute and by contract. He is sued in his individual capacity.

15.  At all relevant times, Defendant Dennis Harris was employed as a detective by the BPD, acting under color of law and in his individual capacity within the scope of employment pursuant to the statutes, ordinances, regulations, policies, customs, and usage of the City of Boston and the Commonwealth of Massachusetts. Upon information and belief, he is entitled to indemnification under statute and by contract. He is sued in his individual capacity.

16.  At all relevant times, Defendant Kevin McGoldrick was employed as a detective by the BPD, acting under color of law and in his individual capacity within the scope of employment pursuant to the statutes, ordinances, regulations, policies, customs, and usage of the City of Boston and the Commonwealth of Massachusetts. Upon information and

4

belief, he is entitled to indemnification under statute and by contract. He is sued in his individual capacity.

17. At all relevant times, Defendant Paul Schroeder was employed as a detective by the BPD, acting under color of law and in his individual capacity within the scope of employment pursuant to the statutes, ordinances, regulations, policies, customs, and usage of the City of Boston and the Commonwealth of Massachusetts. Upon information and belief, he is entitled to indemnification under statute and by contract. He is sued in his individual capacity.

18. At all relevant times, Defendant Paul Farrahar was employed as a commanding officer in the Homicide Unit by the BPD, acting under color of law and in his individual capacity within the scope of employment pursuant to the statutes, ordinances, regulations, policies, customs, and usage of the City of Boston and the Commonwealth of Massachusetts. Upon information and belief, he is entitled to indemnification under statute and by contract. He is sued in his individual capacity.

19. Defendant City of Boston ("City") is a municipality of the Commonwealth of Massachusetts, which oversees the BPD. At all relevant times, the City was responsible for the policies, practices, and customs of the BPD. The City is additionally responsible for the acts of each of the individual Defendants referenced above while they were employed by the City and while acting under color of state law and within the scope of their employment. At all relevant times, the individual Defendants were employed by or acting as agents of the City and the BPD while conducting the investigation described in this Complaint.

## FACTUAL ALLEGATIONS

***Stephen Jenkins is shot in Dorchester in retaliation for losing his supplier, Mike White's, drugs.***

20.   At approximately 9:15 p.m. on Saturday, December 15, 2001, Stephen Jenkins was shot and killed in his car in Dorchester by or on orders of his drug supplier, Mike White.

21.   Weeks before his murder, Stephen lost a package of drugs that had been fronted to him for sale by White; as a result, he owed White thousands of dollars that he could not repay.

22.   In the weeks before his murder, Stephen expressed concern that White might retaliate against him for this unpaid debt. He asked friends and relatives if he could stay with them.

23.   The evening he was killed, December 15, 2001, Stephen drove into White's Dorchester neighborhood to meet with White and "re-up" his supply. Stephen called White numerous times that day, including calls at 8:53 p.m. and 8:54 p.m.—only 20 minutes before he was shot. Virtually every time Stephen called White, he would follow up with a call to Dennis Jones, a mutual associate of Stephen and White's; the three had been in prison together, when all were serving time for violent felonies.

24.   At approximately 9:00 p.m. on December 15, Stephen was observed driving his Lincoln Continental in Dorchester with a young Black male passenger (matching the description of Jones's 14-year-old son) who was nervously looking around.

25.   Minutes later, Stephen was shot and killed by a gunman using a .380 caliber firearm and standing outside the car on the front passenger side. The passenger fled, leaving the passenger side door open, and Stephen slumped in the driver's seat.

***Shaun Jenkins is innocent.***

26.   Shaun is actually innocent of the shooting murder of his cousin Stephen.

27.  Shaun was not present in Dorchester when the murder happened and had no knowledge of or involvement with the shooter.

28.  Shaun did not know and had no ties to Mike White.

29.  Consistent with Shaun's innocence, no physical or forensic evidence ever tied him to the crime.

30.  No murder weapon was ever recovered, much less one linking Shaun to the crime.

31.  No witness ever claimed to have seen Shaun at the scene of the shooting, or even in the Dorchester area that night. In fact, Shaun was out of state the evening of the shooting.

***Detectives immediately uncover a lead pointing to Mike White's associate, Dennis Jones.***

32.  Detectives from the Boston Police Homicide Unit arrived at the scene within minutes of the 9:15 p.m. shooting, including Sergeant Detective Daniel Keeler, who would ultimately lead the Unit's investigation.

33.  Detective Kevin McGoldrick was also on the scene and was a member of Keeler's squad. He would also ultimately help lead the investigation. Another member of the squad – Detective Paul Schroeder was also a member of the squad and would continue to support the investigation. Detective Dennis Harris was not present at the scene that night but would also help lead the investigation as a member of the squad.

34.  The first Boston police officers arrived around 9:30 p.m. Stephen was then transported by ambulance to a hospital. Only at 9:59 p.m. did a doctor at the hospital finally pronounce Stephen dead.

35.  Meanwhile, detectives were photographing and processing the crime scene, including collecting Stephen's cell phone and a baggie that appeared to contain cocaine and

recovering spent .380 caliber bullets and shell casings from the scene. The detectives did not clear and release the scene until after 11:00 p.m. that evening.

36. Yet Stephen's long-term girlfriend, Karen Brown, called a local police station in Dorchester that night at some point between 9:30 and 11:00 p.m. She reported to Detective Schroeder that she had already learned that her boyfriend was dead, and she left numbers for police to call her back, including her home, cell, and work numbers. Her report—before anyone had been notified by police of the murder—should have raised alarms for police.

37. On December 16, the next day, Brown called back and spoke to Detective Bob Kenney, telling him that at about 9:30 p.m. the previous night, Dennis Jones—a friend of Stephen's—had told her of her boyfriend's death.

38. Brown recounted that Jones had told her that he had learned of Stephen's death from police. According to Jones, he called Stephen's cellphone, the police answered, and the police told him that Stephen was dead. This information was relayed in a memo to Detective Keeler for the investigation file.

39. As both Detective Kenney and Detective Keeler would have understood, Jones's story was highly implausible: The police did not arrive on the scene until 9:30 p.m., which is when Brown reported receiving the call. Stephen was not declared dead until he arrived at the hospital about half an hour later. No officer answered Stephen's cell phone at the scene. And no responsible police officer would have alerted a random person of a death upon arriving at the scene of the crime before any next of kin had been notified.

40. Brown's report was evidence that Jones knew about Stephen's murder before even the police did.

41. There is no record of Detective Keeler or any other Homicide Detective or member of the BPD ever following up on this obvious investigative lead.

*Police fabricate evidence implicating innocent Shaun Jenkins.*

42. Detective Keeler continued to play a leadership role in the investigation. He and two colleagues—Detectives Harris and McGoldrick—worked together to oversee and guide the investigation with other members of their squad, including Detective Schroeder ("Homicide Detectives"). They shared notes and evidence, coordinated strategy, and shared responsibility for informing the Suffolk County District Attorney's Office about the progress and fruits of their investigation.

43. Paul Farrahar was the commanding officer of the Homicide Unit and supervised the investigation into Stephen's murder. Upon information and belief, Farraher received and reviewed the reports in the police files, including those in BPD's shared server, discussed the case with his subordinates, and approved various strategic investigatory decisions.

44. Several days after the murder, Detective Keeler spoke with Craig Jenkins—a cousin of both Shaun and Stephen.[2] Detective Keeler reported that Craig pointed the finger at Shaun.

45. Specifically, Detective Keeler reported that Craig said Shaun had showed him a .380 caliber silver handgun in his minivan approximately a week before the murder and that Shaun had threatened to kill Stephen. Detective Keeler also claimed that Craig reported that Shaun admitted that he had earlier attempted to shoot Stephen at a barbershop in Brockton, but the gun had jammed.

46. These statements were not true. Shaun did not threaten to hurt or kill Stephen and did not show Craig any gun. Shaun never pulled a gun on Stephen and never told Craig that he had.

---

[2] Because Craig also shares a last name with Shaun and Stephen, he too is referred to throughout the Complaint by his first name.

47. Detective Keeler fabricated this false evidence implicating Shaun, telling Craig what to say and feeding him details (including that he should claim Shaun had a .380 caliber firearm—the same type that was used to kill Stephen). Detective Keeler knew these statements were false.

48. After this conversation, the Homicide Detectives—including Detectives Keeler, Harris, McGoldrick, and Schroeder—focused their investigation exclusively on Shaun, even though they never uncovered evidence that directly linked Shaun to the shooting.

***Police search Shaun Jenkins's apartment, find no incriminating evidence, and fabricate admissions.***

49. Based on the false and fabricated statements from Craig, the Homicide Detectives obtained a warrant to search the Fall River apartment Shaun shared with his girlfriend, Kenitra Newton. On December 21, 2001, Detectives McGoldrick, Harris, Keeler and Schroeder conducted a thorough search of the apartment looking for evidence implicating Shaun in his cousin's murder, including a .380 caliber handgun or ammunition. Consistent with Shaun's innocence, they found no such evidence.

50. The Homicide Detectives also observed on December 21, 2001, that Shaun had a pronounced injury to his left eye that was in the process of healing; his eye was swollen and bloodshot. The night before the murder, Stephen became angry with Shaun after Shaun gave a ride to a woman Stephen was casually dating. Stephen had punched Shaun during that argument, injuring his left eye. The cousins had reconciled the following morning.

51. Shaun's injury was exculpatory because it would have been apparent at the time of murder, and the eyewitness—who had given a detailed description of eye movements of the passenger in Stephen's car immediately before he was killed—had not described the passenger having any injury to his eye.

10

52. While at the apartment, Detectives McGoldrick and Harris interviewed Newton separately from Shaun. In a misguided attempt to protect Shaun, Newton provided a false alibi, claiming she and Shaun had been driving to North Carolina at the time of Stephen's murder to attend a family member's funeral. She also falsely claimed that she had caused the injury to Shaun's eye, saying she had hit him with her shoe out of jealousy that he was talking to another girl.

53. The Homicide Detectives correctly suspected Newton's account was false. But they failed to uncover any evidence linking Shaun to the shooting.

54. Detectives McGoldrick, Harris, Keeler, and Schroeder later falsely reported that Shaun had made incriminating statements to them around the time of the search, including falsely attributing to Shaun statements about the false alibi.

*Police bury cell phone records strongly pointing to guilt of Mike White.*

55. While the Homicide Detectives failed to uncover any evidence linking Shaun to the murder, they learned of ample evidence implicating the true perpetrator. They learned that Mike White was Stephen's drug supplier, and that White had fronted a supply of crack cocaine to Stephen which Stephen had lost, leaving him $3000 in debt to White. The Homicide Detectives also learned that White lived approximately one and half blocks from Juliette Street, Dorchester, where Stephen was murdered.

56. From Stephen's car on the night of the murder, BPD Detectives had recovered his cell phone and his address book. Early in the investigation, Stephen's cell phone records were obtained and provided to the Homicide Detectives—including Detectives Keeler, Harris McGoldrick, and Schroeder—who according to practice were tasked with comprehensively analyzing the records and conveying any relevant information to the prosecuting attorneys.

57. Through a review of these records, the Homicide Detectives learned of still more evidence strongly implicating White in the murder. They learned that Stephen had called White multiple times the afternoon and evening leading up to his death, including a call at 8:53 p.m. and a 3-minute call at 8:54 p.m.—only 20 minutes before Stephen was shot and killed.

58. The Homicide Detectives had also learned from witnesses that shortly before his death Stephen had reached out to people close to Shaun—including Shaun's girlfriend, Kenitra Newton (with whom Shaun lived), and Shaun's mother, Stacy Jenkins (Stephen's aunt)—looking for a place to stay; this demonstrated Shaun was not the person Stephen feared. Stephen's phone records confirmed these accounts; for example, Newton reported that Stephen had called her on Friday, December 14, 2001, asking if he could stay in her apartment; Stephen's phone records demonstrated three calls to Newton's number in rapid succession at 9:51 p.m., 9:57 p.m., and 9:58 p.m. on Friday, December 14, 2001, before Newton returned his call at 10:09 p.m.

59. Although the Homicide Detectives were expected to convey any relevant information about the investigation and in particular the phone records they reviewed to the prosecutors, Defendants never communicated this exculpatory information about Stephen's phone records to the prosecutors.

60. Indeed, the Homicide Detectives did not volunteer any information about White or any of the evidence implicating him to prosecutors; rather, prosecutors only happened to learn about White independently from third-party witnesses. And when prosecutors inquired about White as a potential suspect, the Homicide Detectives in this case—including Detectives Keeler, McGoldrick, and Harris—falsely represented that their investigation had determined there was nothing there.

61. Critically, the prosecutors never learned about the information inculpating White and exculpating Shaun in Stephen's phone records.

*The Homicide Detectives fabricate evidence.*

62. Although ample evidence pointed to a different perpetrator—White—the Homicide Detectives remained committed to prosecuting Shaun. They were aware that Shaun was selling drugs in southeastern Massachusetts and put forward a theory that Shaun murdered Stephen because Stephen was taking over Shaun's "turf." This was completely false: Shaun had nothing to do with Stephen's murder, and there was no dispute about "turf" between the two of them.

63. In March 2002, Detectives McGoldrick and Harris reinterviewed Karen Heinen, the witness who had observed Stephen and his passenger shortly before the shooting and had called 911 immediately after. Heinen reaffirmed that the passenger she saw was a young, slightly built teenager; she did not mention seeing any eye injury. Her description was inconsistent with what the police already knew—that Shaun would have had a visibly bruised and swollen eye on the night of Stephen's death. Nevertheless, the Homicide Detectives continued to focus on Shaun.

64. In April 2002, Detectives Keeler, Harris, and McGoldrick interviewed Tameisha Miranda (whom Stephen had been casually dating for the three weeks before his death) and her mother Janet Riordan. They told the detectives that Shaun and Stephen had an argument at Riordan's house the night before Stephen was killed, but that they had made up in the morning. Riordan reported that two of Shaun's friends (Dia DeMiranda and Doreen Fernandes) had also witnessed the fight. Neither Miranda nor Riordan provided the detectives with any evidence directly implicating Shaun.

65. After meeting with the Homicide Detectives, Miranda and Riordan both provided false evidence consistent with the Detectives' theory of a possible motive: that there was a dispute over drug "turf" between Shaun and Stephen.

***Craig refuses to testify—and then changes his mind months later only after Detective Keeler pays him $100.***

66. In August 2002, the prosecution called Craig to testify to the grand jury. Craig had been the only witness reported to have directly implicated Shaun in Stephen's killing. However, Craig invoked his Fifth Amendment privilege and refused to testify.

67. As recounted in an October 3, 2002, internal memo, the prosecution was skeptical about the case against Shaun by the fall of 2002. In the absence of any physical evidence or eyewitnesses implicating Shaun, any prosecution depended on the evidence of a possible motive from Riordan and Miranda, as well as the evidence from Craig. But the prosecution noted that Riordan and Miranda's testimony about a supposed drug feud between Stephen and Shaun, which had allegedly developed over the course of a week and a half, was "somewhat contrived."

68. That made Craig's testimony critical to the case. And given events raising further questions about the reliability of his testimony—including an arrest in mid-2002 for impersonating a police officer to rob victims at knifepoint—the prosecution noted the need for an "even closer examination of his strength and credibility as a witness."

69. Around this time, Detective Keeler met with Craig and induced him to provide the fabricated evidence to the grand jury, including by providing Craig with a $100 cash payment. Although Detective Keeler contemporaneously recorded this $100 payment to Craig in an internal memo to his commanding officer, Deputy Superintendent Farrahar, which also would have been known to the other detectives on the case, he never reported

14

this payment to the prosecution or provided the prosecution a copy of his memo—even though the prosecution had made clear that it believed Craig's credibility was in question and anything bearing on his credibility should be scrutinized. Similarly, no other detective or member of the BPD –including McGoldrick, Harris, Schroeder, or Farrahar – took any steps to provide this memo to the prosecution or defense.

70.  Detective Keeler and the other Homicide Detectives also made it clear to Craig that if he repeated the fabricated story they had fed him and Shaun was convicted, Craig would not have to worry about the potential of serious criminal charges looming against him. This inducement for Craig's testimony was never reported to the prosecution, either.

71.  On October 18, 2002, Craig took the stand. This time, he repeated the fabricated account Detective Keeler had fed to him implicating Shaun in the murder of Stephen, including that Shaun had threatened to kill Stephen, that Shaun had admitted to attempting to shoot Stephen at a barbershop in Brockton but the gun had jammed, and that Craig had observed Shaun with a .380 caliber gun in his van a week before Stephen's murder.

72.  In his grand jury testimony, Craig also added another false charge against Shaun which had also been fed to him by Keeler and other Homicide Detectives: that Shaun had allegedly threatened him in an attempt to prevent his grand jury testimony, including coming by his apartment late at night to intimidate him. This was false—Shaun never threatened Craig or came by his house to intimidate him. Craig understood detectives wanted him to make these false statements in support of a possible witness intimidation charge.

73.  Neither the grand jury nor the prosecution knew that Craig's account had been fabricated by Homicide Detectives or that Craig's participation had been induced by a cash payment and the understanding he could avoid serious charges against him.

74. Craig's false and fabricated testimony reinvigorated the case against Shaun: In December 2002, a warrant was issued for Shaun's arrest.

75. Shaun voluntarily surrendered on December 26, 2002, and remained in custody from that point forward for nearly nineteen years.

*Homicide Detectives fabricate taped statement from Doreen Fernandes.*

76. Despite Craig's testimony implicating Shaun, the prosecution remained skeptical about the case. And now that Shaun was incarcerated, there was mounting pressure to obtain an indictment or release him. But the prosecution still believed additional evidence was needed to obtain an indictment.

77. In particular, the prosecution—which had independently learned from third-party witnesses of some of the evidence implicating White—repeatedly asked the Homicide Detectives for evidence demonstrating that White was not a plausible suspect. Although the Homicide Detectives continued to falsely represent that their investigation had concluded that White was not involved in Stephen's murder, they did not produce any evidence substantiating this assertion. (White himself had died in February 2002).

78. For example, Detective Keeler for months represented to the prosecution that Mark Gaines, a mutual friend of White and Craig, could tell prosecutors and testify to the grand jury that Stephen did not owe any debt to White and that there were no hard feelings between them. But although the prosecutor repeatedly followed up, Detective Keeler and his colleagues (including Detectives McGoldrick and Harris) never produced any such evidence, without any explanation provided. In reality, as the Homicide Detectives knew, they could not produce such evidence because their representations were false.

79. Instead, Detectives Keeler and McGoldrick fabricated additional evidence against Shaun: a fabricated taped statement from Doreen Fernandes.

16

80. On January 10, 2003, Detectives Keeler and McGoldrick approached Fernandes—who detectives knew had been present using drugs at Riordan's home, along with DeMiranda, in the early morning hours of December 15, 2001, when Stephen had physically assaulted Shaun—and interviewed her at the Wareham Police Department.

81. Detectives Keeler and McGoldrick made clear to Fernandes they wanted her to give statements implicating Shaun in the murder of Stephen. When Fernandes truthfully reported she did not have any information that could help them, Detective Keeler refused to accept that response, threatening to arrest her for obstruction of justice for not "fully cooperating."

82. Detectives Keeler and McGoldrick then fed Fernandes a false account consistent with their false theory of the case and the fabricated statements they had obtained from Craig, Riordan, and Miranda. Only after they had threatened Fernandes and told her what to say did Detectives Keeler and McGoldrick begin recording a taped statement.

83. Out of fear of the detectives and of going to jail, on the taped statement Fernandes repeated the false account Detectives Keeler and McGoldrick had fed to her. On the tape, Fernandes falsely reported that Shaun and Stephen had a dispute because Stephen was competing with Shaun's drug business; that when Stephen assaulted Shaun in the early morning of December 15, he also stripped him naked and Shaun was forced to run down the street naked; that in the car leaving Riordan's house that night with DeMiranda, Shaun had threatened to kill Stephen; and that later Shaun threatened  DeMiranda that he would "take care of her like he did to Steve." This was all false.

84. After obtaining the fabricated taped statement, Detective Keeler gave Fernandes $100 in cash and told her to call him if she needed more money.

85. Although Fernandes had succumbed to the Detectives' threats to provide the false taped statement, she refused to testify before the grand jury because she knew what she reported was false.

***Prosecutor recommends against charging Shaun Jenkins due to the weakness of the evidence.***

86. On April 3, 2003, line prosecutor Lynn Brennan wrote a memo to her supervisor summarizing the weakness in the evidence and concluding she did "not believe that there is sufficient evidence with which to charge Shaun Jenkins" and that any prosecution would be based "completely on inference and conjecture rather than either direct or compelling circumstantial evidence."

87. ADA Brennan noted (1) there was no evidence of Shaun's presence at the crime scene; (2) there was no evidence Shaun fit the description of the person observed in Stephen's car at the crime scene; and (3) there *was* evidence to rebut the claim of Shuan's motive: although Stephen and Shaun had had an altercation the night before the shooting, the evidence indicated they had reconciled. Stephen met with Shaun several hours after the fight and came home reporting "everything is fine, we made up, everything is cool," and Stephen was making arrangements to move into Shaun's mother's Brighton apartment.

88. ADA Brennan also summarized the evidence she was aware of implicating a different suspect, White: that Stephen was on his way to re-up with White at approximately 7 or 8p.m. the night he was killed, that he owed White a "great deal of money" after losing his drug stash, and that he was murdered at 9:20 p.m. approximately one and a half blocks from where White lived. Notably, this summary did not include—because the Homicide Detectives had concealed it—other evidence implicating White in the murder, including the compelling evidence from Stephen's phone records.

89.   ADA Brennan also recounted the evidence implicating Shaun—which, unbeknownst to the prosecution, was false and fabricated by the Homicide Detectives. This included (1) fabricated statements by Craig, including the alleged threats Shaun made to kill Stephen and Craig's claim he observed Shaun with a .380 handgun; (2) the fabricated report that Shaun lied to the police about his whereabouts at the time of the murder; and (3) evidence of an alleged dispute over drug turf between Shaun and Stephen.

90.   ADA Brennan explained that she reached her recommendation that no charges be sought without additional evidence notwithstanding the pressure from Detective Keeler and his squad (including Detectives McGoldrick, Harris, and Schroeder) that Shaun should be prosecuted.

91.   Despite ADA Brennan's recommendation—and based on the fabricated evidence implicating Shaun and without knowing the exculpatory evidence the Homicide Detectives had suppressed—the prosecution decided to seek an indictment.

92.   On April 4, 2003, the prosecution played Fernandes's fabricated taped statement to the grand jury. DeMiranda also testified to the grand jury and truthfully contradicted the fabricated statement from Fernandes, including denying that Shaun had made any threat to Stephen in the car on December 15 or that he had ever made any statement to her about Stephen or what happened to him. Nevertheless, that same day, the grand jury indicted.

***Shaun Jenkins is wrongly convicted.***

93.   By the time of trial, there was still minimal evidence implicating Shaun. No physical or forensic evidence linked him to the crime, no evidence placed him in Dorchester that night, and he had consistently maintained his innocence. Although there were no witnesses to the

shooting itself, Heinen had observed a passenger in the car moments before the shooting—
and he didn't look like Shaun.

94. The fabricated evidence from Craig remained critical to the prosecution. Craig by this point
was incarcerated in Virginia for forgery and had to be transported in custody to
Massachusetts to testify. Before trial, the prosecution represented to the court that without
Craig's testimony, the trial could not go forward.

95. Detectives, including Detectives Harris and Keeler, met with Craig before he testified at
trial. They emphasized the importance of his testimony to any conviction and instructed
him to repeat the fabricated statements he had given at the grand jury, which Craig
subsequently did. Craig understood from Detective Keeler and other BPD detectives that if
Craig testified as instructed and if Shaun was convicted, any potential charges against him
would either be dropped or not pursued.

96.  Riordan and Miranda also provided false testimony implicating Shaun, consistent with the
false statements they gave after meeting with the Homicide Detectives.

97. Fernandes testified for the first time at trial. Initially she provided truthful testimony, which
did not include the fabricated evidence falsely implicating Shaun in the murder; the
prosecution attempted to "refresh her recollection" or impeach her with the transcript of the
fabricated taped statement, but was largely unsuccessful.

98. Over a lunch break, Detective Keeler met with Fernandes, played her the fabricated taped
statement, and threatened her that if she didn't testify consistently with that fabricated
statement she would go to jail. Fernandes subsequently testified to some of the fabricated
statement, including the false claims that Shaun had threatened to hurt Stephen after
Stephen had assaulted him, that Shaun had later threatened DeMiranda that he would take

care of her like he had taken care of Stephen, and that Shaun and Stephen had been fighting over drug turf.

99. Detective McGoldrick repeated the fabricated statements falsely attributed to Shaun, including about the false alibi, from the report.

100. The jury did not learn that the Homicide Detectives had fabricated these witness statements. Nor did the jury hear other evidence demonstrating the unreliability of the statements, including the payments made to both Craig and Fernandes by Detective Keeler, the threats Detective Keeler made to Fernandes; or the understanding detectives had with Craig that he would receive leniency for any of his own criminal acts in exchange for his testimony.

101. The jury never heard evidence implicating White in the murder—including most significantly the phone records demonstrating that Stephen had called White repeatedly leading up to his murder, including two calls only 20 minutes before he was killed.

102. Based on this fabricated evidence and without the benefit of the exculpatory evidence the Homicide Detectives withheld, on April 28, 2005, the jury wrongly convicted Shaun of first-degree murder. Shaun received the mandatory sentence: life without parole.

*A post-conviction investigation reveals substantial exculpatory evidence that was suppressed.*

103. After his wrongful conviction, Shaun continued to fight to prove his innocence, assisted beginning in 2011 by the Committee for Public Counsel Services Innocence Program.

104. Shaun pointed to evidence learned from third parties after his conviction suggesting that the true perpetrator was Mike White. Both Craig and Fernandes, moreover, provided affidavits disavowing their trial testimony and describing the inducements and pressure from the Homicide Detectives.

105. Based on Defendants' misrepresentations that White was not involved in Stephen's murder and Defendants' false denials that any such inducements or pressure had occurred, the

prosecution opposed Shaun's initial motions for post-conviction relief, and they were denied.

106. In the summer of 2020, however, the newly formed Integrity Review Bureau of the Suffolk County District Attorney's Office allowed Shaun's post-conviction counsel unfettered access to its file. Scrutiny of the file revealed evidence implicating White in Stephen's murder—evidence that was never disclosed to the defense, court, or jury.

107. These records corroborated other evidence implicating White in the murder, including that White was Stephen's drug supplier, that Stephen owed him a drug debt that he could not repay, that Stephen had headed to "re-up" at the time he was killed, and that he was shot in White's neighborhood, less than two blocks from where White lived.

108. Based on this evidence, Shaun moved for post-conviction discovery against the BPD. The Commonwealth assented, and the Court ordered the BPD to provide relevant documents.

109. When the BPD finally complied with this order in 2021, Shaun learned for the first time that Detective Keeler had kept an electronic file which was never provided to the prosecution or defense. This file included contemporaneous documentation that Keeler had provided Craig $100 cash at the time he waived his Fifth Amendment rights and provided false evidence implicating Shaun.

### *The Boston Police Department had a pattern, practice, and/or custom of fabricating and coercing false testimony and suppressing exculpatory evidence.*

110. In the early 1990s, Boston, like many American cities, experienced historically high rates of violent crime. The City and the BPD responded by adopting a public "zero tolerance policy" for crime, and pressured officers to rapidly increase clearance rates at any cost. In

turn, the BPD fostered a culture of prioritizing swift investigations over accurate, fair, and lawful ones.

111. This culture tolerated or even encouraged egregious constitutional violations; namely, fabricating and coercing evidence as well as suppressing exculpatory evidence.

112. Pressure for increased clearance rates and the resulting culture of tolerating or condoning unconstitutional practices was especially pronounced in the BPD's Homicide Unit. The Homicide Unit was a single team that investigated all homicides in Suffolk County. The Unit was comprised of approximately twenty detectives who worked in multi-member teams. The Unit shared a single office space. During the early 2000s, that Unit was headed by Deputy Superintendent Paul Farrahar.

113. During the 1990s and early 2000s, members of the Homicide Unit had a pattern, practice, and custom of fabricating and coercing evidence as well as suppressing exculpatory evidence, particularly evidence that implicated suspects other than the BPD's chosen target.

114. BPD supervisors and policymakers for the City knew that officers, particularly those in the Homicide Unit, routinely fabricated and coerced evidence and suppressed exculpatory evidence but took no steps to adequately train, supervise or discipline officers in order to prevent these constitutional violations from happening.

115. For example, in the mid-1990s, a team lead by a Captain in the Homicide Unit, Edward McNelly, framed a young Black man named Sean Ellis for the murder of an off-duty Boston police officer. As in Shaun's case, no physical evidence linked Ellis to the murder. Detectives fabricated and coerced evidence: A purported eyewitness was brought into the Homicide Unit where detectives presented her with photo arrays. When she failed to identify Ellis on her own, detectives coerced her into a false identification. Detectives—

including Detectives Keeler and Edward McNelly—later suppressed exculpatory evidence of a possible third-party culprit: Another member of the BPD reported that he had investigated reports of threats made to the victim by a third party; that report was never provided to the defense. Based largely on these violations by BPD detectives, Ellis was exonerated in 2016.

116.   In another similar case in the early 1990s, Homicide detectives framed a young Black man named Barry Kamara with murder, again, by suppressing exculpatory evidence of a third-party culprit. Kamara was convicted based on circumstantial evidence alone, and later investigation revealed that members of the Homicide Unit suppressed evidence implicating other suspects: For example, the mother of the victim reported to police that she was told that another individual, Bernard King, had killed her son; police never followed up on that lead nor did they turn over notes of that conversation to the defense. A victim in a related case reported to police that he heard that someone with the initials "BK" had committed the murder in Kamara's case, but police again failed to follow up on that lead and failed to turn over notes of that conversation to the defense. Based largely on this suppressed exculpatory evidence, Kamara's conviction was overturned in 2023.

117.   The same pressure to close cases and culture of tolerating and even encouraging constitutional violations to reach that end led to Ellis and Kamara's wrongful convictions; it also drove the Homicide Detectives in Shaun's case to fabricate evidence, coerce witnesses, and suppress exculpatory evidence to secure his wrongful conviction.

118.   The pressures exacted by the City and the BPD's priorities were well-known at the time.

119.   In fact, the Homicide Unit's lawless and ineffective tactics were so well-known that the Boston Phoenix published a multi-part series in 2005 about the Unit's problems. The paper

documented that the "typical" way that "murder cases are often investigated in Boston" consisted of "detectives leap[ing] to a conclusion based on one bit of circumstantial evidence or one person's often-questionable claim, and then seek—and believe—only evidence and testimony that supports that conclusion." It also ran a follow-up article devoted to Keeler's misconduct in 2006.

120. Even the judge in Shaun's case alluded to the Homicide Detective's problems in a pre-trial conference months before Shaun's trial. In a hearing in January 2005, Judge Margaret Hinkle explicitly referred to the increased "pressures" bearing down on Detective Keeler and his squad during this time period. The Court "acknowledg[ed]" and expressed "sympath[y]" for the fact that [Detective Keeler's] "squad [was] under enormous pressure right now to put these cases together." The Court also specifically noted for the record that Detective Keeler was in the courtroom that day, and alluded to "being very cognizant of [Detective Keeler's] other problems."

121. Detective Keeler's unlawful conduct, in particular, resulted from the lawless culture at the BPD in the year preceding Shaun's conviction at trial. Keeler had a reputation for being overzealous and breaking rules in order to close cases. Despite this reputation, the BPD promoted Keeler because of his strong clearance rate, ignoring how he achieved those results and despite repeated incidents of misconduct.

122. But the price of prioritizing closings over accuracy and lawful investigations ultimately led many of Keeler's cases to unravel. For example, in 2004, Detective Keeler was the lead investigator in a series of first-degree murder cases that lead to highly publicized dismissals, acquittals, and mistrials. In each of these cases, Detective Keeler's misconduct

Case 1:23-cv-11299-LTS   Document 1   Filed 06/08/23   Page 26 of 45


and disregard for rules and his constitutional obligations were brought to light and resulted in losses for the prosecution.

123. In March 2004, Keeler was revealed to have wrongfully accused William Leyden of murdering his brother, and to have engaged in unconstitutional misconduct. Detective Keeler was the lead investigator in the murder of Jackie Leyden, found decapitated in his home. Despite knowing that William lacked a motive for the killing, Detective Keeler arrested William because his brother's DNA was found in his car. Keeler suppressed evidence linking the modus operandi in the Leyden murder to a similar killing in Lynn, for which William Leyden could not have been responsible.

124. In February of 2004, however, Eugene McCallum, a man with whom the victim previously fought and who was at the victim's house the night of his death, confessed to the murder. The next month, charges against Leyden were dismissed and he sued Keeler.

125. In April 2004, Detective Keeler was revealed to have again engaged in unconstitutional misconduct. He led an investigation that targeted a teenager who he coerced into giving a false confession. Keeler testified in the trial of Kyle Bryant. Detective Keeler had extracted a confession from 17-year-old Bryant, but when the jury heard Detective Keeler's taped interrogation, they were disturbed by his aggressive questioning and by the fact that certain parts of the interrogation were not recorded at all. Bryant maintained his innocence, arguing that his confession was coerced. He was acquitted on April 29, 2004.

126. Keeler's well-known misconduct came to light in another in November 2004, *Commonwealth v. James Bush*, Mass. Superior Court Dkt 0284CR10327. By that point, prosecutors were so concerned about Keeler's growing public record of misconduct that they filed a motion to preclude defense counsel from introducing evidence of his "prior bad

acts," in other words, evidence that Keeler had a pattern or practice of engaging in unconstitutional and unlawful actions that damaged his credibility.

127. Under pressure of cross-examination at trial, Keeler admitted under oath that he wrote false statements into the police report and a sworn affidavit. Bush maintained his innocence and was acquitted on November 9, 2004.

128. In December 2004, Keeler testified as the lead investigator in the trial of Marquis Nelson and Joseph Cousin. There, Detective Keeler obtained a key statement from the Commonwealth's 15-year-old star witness by questioning him without his parent/guardian present. Nelson was acquitted on December 22, 2004, and the next day, the Commonwealth moved for a mistrial in the case against Cousin.

129. All of these issues were well known to supervisors and the City at the time.

130. By the end of 2004, Detective Keeler had been removed from the Homicide Unit, although he stayed on the force and continued to be centrally involved in the preparation for Shaun's trial in 2005.

131. In addition to knowledge of Keeler's reputation and his repeated, serious misconduct, there were also specific signs that Keeler and his squad had engaged in misconduct in Shaun's case, including the alarms raised by the prosecution about the serious problems with the Homicide Detectives' investigation. Yet Keeler's memo to Farrahar, on the BPD's server and documenting the payment to Craig, was never produced to the prosecution or the defense.

132. Nevertheless, Shaun was prosecuted in the spring of 2005 based on evidence collected and produced by Detective Keeler and the Homicide Detectives in the prior years.

133. The BPD also was on notice of Keeler and his squad's misconduct during the post-conviction litigation when Shaun asserted his innocence and Craig and Fernandes signed affidavits stating that Keeler had coerced their false testimony implicating Shaun. The BPD's own officers, moreover, were the ones conducting the investigation defending the prosecution. Nevertheless, during this entire time, the BPD had key exculpatory evidence on its servers with specific notice to a high-ranking BPD officer, Farrahar, which was never produced until it was provided to post-conviction counsel in August 2021.

134. Detective Keeler's supervisors were well aware of his and his squad's unconstitutional conduct. He had a reputation as a detective who cut corners, and was a controversial member of his department throughout his time at BPD.

135. Yet, no one in the BPD, including Keeler's supervisors, took any steps during the investigation into Shaun or prior to his trial to ensure that Detective Keeler and the other Homicide Detectives had not engaged in unlawful practices, including ensuring that evidence was not fabricated, that witnesses were not coerced, and that exculpatory evidence was not suppressed.

136. BPD leadership – including Paul Farrahar – did not adequately train or supervise their Homicide Unit detectives on investigative conduct, including their disclosure obligations to the prosecution and, by extension, to defense counsel. Detective Keeler himself admitted to the Boston Globe that he and his colleagues had no guidance on how to approach investigations and disclosures to defense counsel, stating that there were no clear protocols or training for homicide investigation. As a result, he had room to engage in misconduct—like fabricating evidence and suppressing exculpatory evidence without repercussion.

137. Thus, alongside maintaining policy, practice, and/or custom of unlawful suppression of exculpatory evidence and manufacturing evidence, BPD leadership also failed to supervise and train their homicide detectives—including ensuring they complied with basic legal obligations when interviewing witnesses and reporting their statements, as well as producing all exculpatory evidence to the prosecution.

138. Likewise, BPD leadership failed to discipline Detective Keeler and his colleagues—even as they attracted notoriety for their propensity to "cut corners" by fabricating evidence and suppressing exculpatory evidence led to failed prosecutions and innocent defendants going to prison.

139. The BPD also had a custom and practice of withholding exculpatory evidence, including in particular evidence maintained in Detectives' separate files, whether paper "desk files" or files kept electronically. Despite awareness of this ongoing issue, the BPD permitted this widespread failure to disclose to persist for decades.

### *The Superior Court grants Shaun Jenkins's motion and vacates his conviction.*

140. Based on the newly disclosed evidence, and with the Commonwealth's consent, Shaun moved to vacate his conviction.

141. After his attorneys filed a motion for a new trial, Shaun was released from prison on September 24, 2021.

142. On December 20, 2021, Judge Kenneth Salinger of the Superior Court granted Shaun's motion to vacate his conviction.

143. The Court found "that the prosecution failed to produce exculpatory evidence that could have made a real difference at trial and that Jenkins' defense was harmed as a result; Jenkins could have used this evidence to suggest that Stephen was killed by someone else

(a third-party culprit defense) and to show that the police failed to properly investigate likely suspects (a Bowden defense)."

144. On December 22, 2021, the Suffolk County District Attorney's Office filed a nolle prosequi on the charges against Shaun.

145. Shaun is innocent of the crime of murdering Stephen. As the Superior Court acknowledged, newly-released evidence indicates he was actually killed by or at the direction of Mike White, Stephen's drug supplier to whom he owed a substantial debt he could not repay.

146. As a result of his unlawful conviction, Shaun spent nearly 19 years—most of his twenties and all of his thirties—in prison for a crime he did not commit. Now he is 45 and faces the challenge of rebuilding his life in the wake of his unlawful incarceration.

**PLAINTIFF'S DAMAGES**

147. The unlawful, intentional, willful, deliberately indifferent, reckless, or bad-faith acts and omissions of Defendants caused Shaun to be falsely arrested and imprisoned, unfairly tried, wrongfully convicted, and incarcerated for nearly 19 years for a crime he did not commit.

148. As a direct result of Defendants' intentional, bad-faith, willful, wanton, reckless, or deliberately indifferent acts and omissions, Shaun sustained injuries and damages that continue to date and will continue into the future, including: loss of freedom for nearly nineteen years, pain and suffering, severe mental anguish, emotional distress, loss of family relationships, severe psychological damage, loss of property, legal expenses, humiliation, indignities and embarrassment, degradation, permanent loss of natural psychological development, and restrictions on all forms of personal freedom including but not limited to diet, sleep, personal contact, educational opportunity, athletic opportunity, personal fulfillment, sexual activity, family relations, reading, television, movies, travel, enjoyment, and expression, for which he is entitled to monetary relief.

149. Specifically, and as a direct result of Defendants' intentional, bad-faith, willful, wanton, reckless, or deliberately indifferent acts and omissions, Shaun sustained physical injuries and damages, including: physical pain and suffering, personal injuries, infliction of physical illness and inadequate medical care, for which he is entitled to monetary relief.

150. In addition to the physical injury of being wrongfully imprisoned and confined for nearly nineteen years, Shaun suffered additional physical harm while incarcerated as a direct result of Defendants' intentional, bad-faith, willful, wanton, reckless, or deliberately indifferent acts and omissions.

151. All of the acts and omissions committed by the Defendants described herein for which liability is claimed were done intentionally, unlawfully, maliciously, wantonly, recklessly, negligently, or with bad faith, and said acts meet all of the standards for imposition of punitive damages.

## <u>CLAIMS</u>

### COUNT I

**Against Defendants Keeler, Harris, McGoldrick, Schroeder, and Farrahar**

**Deprivation of Liberty Without Due Process of Law and Denial of a Fair Trial by Fabricating Evidence and Deliberately Suppressing Material Evidence**

**Under 42 U.S.C. § 1983 and the Fourth and Fourteenth Amendments**

152. Plaintiff Shaun Jenkins hereby incorporates by reference paragraphs 1–151 and further alleges as follows:

153. Defendants Keeler, Harris McGoldrick, Schroeder, and Farrahar acting individually and in concert, deprived Shaun of his clearly established constitutional right, under the Fourth and Fourteenth Amendments of the United States Constitution, to a fair trial.

154. Defendants deprived Shaun of his right to a fair trial by fabricating inculpatory evidence, coercing false statements from witnesses, and deliberately withholding exculpatory and impeachment evidence from prosecutors and defense, including without limitation evidence pointing to an alternate suspect, Mike White.

155. Defendants performed the above-described acts under color of state law, intentionally, with reckless disregard for the truth, and with deliberate indifference to Shaun's clearly established constitutional rights.

156. No reasonable officer at any point from 2001 to 2005 would have believed this conduct was lawful.

157. Shaun is completely innocent of the shooting and murder of his cousin, Stephen. The prosecution terminated in his favor when the judgment of conviction and sentence were vacated and all charges dismissed.

158. As a direct and proximate result of Defendants' actions, Shaun was wrongly convicted and imprisoned for nearly nineteen years and suffered the other grievous and continuing damages and injuries set forth above.

## COUNT II

### Against Keeler, Harris, McGoldrick, and Schroeder

### Malicious Prosecution

### Under 42 U.S.C. § 1983 and the Fourth and Fourteenth Amendments

159. Plaintiff hereby incorporates by reference paragraphs 1–151 and further alleges as follows:

160. Defendants, with malice and knowing that probable cause did not exist to arrest Shaun and prosecute him for Stephen's murder, acting individually and in concert, caused Shaun to be arrested, charged, and prosecuted for that crime, thereby violating his clearly established

right, under the Fourth and Fourteenth Amendments of the United States Constitution, to be free from unreasonable searches and seizures.

161. Specifically, Defendants, acting individually and in concert, fabricated evidence and intentionally withheld from and misrepresented to prosecutors and the grand jury exculpatory facts that vitiated probable cause against Shaun and would have impeached witnesses for the prosecution at trial. These Defendants also failed to conduct a constitutionally-adequate investigation in light of evidence pointing to other suspects and away from Shaun.

162. Defendants performed the above-described acts under color of state law, intentionally, with reckless disregard for the truth, and with deliberate indifference to Shaun's clearly established constitutional rights.

163. No reasonable officer at any point from 2001 to 2005 would have believed this conduct was lawful.

164. Shaun is completely innocent of the shooting and murder of his cousin, Stephen. The prosecution terminated in his favor when the judgment of conviction and sentence were vacated and dismissed.

165. As a direct and proximate result of Defendants' actions, Shaun was wrongly convicted and imprisoned for nearly nineteen years and suffered the other grievous and continuing damages and injuries set forth above.

### COUNT III

**Against Keeler, Harris, McGoldrick, Schroeder, and Farrahar**

**Civil Rights Conspiracy**

**42 U.S.C. § 1983**

166. Plaintiff hereby incorporates by reference paragraphs 1–151 and further alleges as follows:

167. Defendants, acting within the scope of their employment and under color of state law, agreed among themselves and other individuals, including Craig Jenkins, to act in concert in order to deprive Shaun of his clearly established Fourth, Fifth, and Fourteenth Amendment rights to be free from unreasonable searches and seizures, false arrest, false imprisonment, malicious prosecution, deprivation of liberty without due process of law, and to a fair trial.

168. In furtherance of the conspiracy Defendants, acting in concert, engaged in and facilitated numerous overt acts, including, without limitation, the following:

    a.  Coercing and/or fabricating statements from Craig to falsely provide a basis to search Shuan's home and take him into custody, then hiding that misconduct from defense counsel and prosecutors;

    b.  Coercing and/or fabricating statements and testimony from witnesses including Craig Jenkins and Doreen Fernandes to inculpate Shuan in Stephen's murder;

    c.  Fabricating inculpatory evidence in reports and pretrial communications with the prosecution, including purported evidence of a false alibi;

    d.  Concealing exculpatory evidence that tended to show Shaun's innocence, including but not limited to evidence that Stephen was murder by or on the orders of White;

Deliberately and recklessly failing to investigate leads pointing to other suspects and corroborating Shuan's innocence; and

e.   Engaging in deliberate deception by deliberating suppressing evidence in violation of *Haley v. City of Boston*, 657 F.3d 39, 49 (1st Cir. 2011), and *Mooney v. Holohan*, 294 U.S. 103 (1935), during the pendency of the case.

169. Shaun is completely innocent of the shooting and murder of his cousin, Stephen. The prosecution terminated in his favor when the judgment of conviction and sentence were vacated and dismissed.

170. As a direct and proximate result of Defendants' actions, Shaun was wrongly convicted and imprisoned for nearly nineteen years and suffered the other grievous and continuing damages and injuries set forth above.

**COUNT IV**

**Against Farrahar**

**Supervisory Liability**

**42 U.S.C. § 1983**

171. Plaintiff hereby incorporates by reference paragraphs 1–151 and further alleges as follows:

172. Shaun's continued wrongful detention was caused by the deliberate indifference and recklessness of supervisory Defendant Farrahar when he failed to adequately supervise, discipline, and train the individual BPD Defendants, including Detective Keeler.

173. Specifically, Defendant Farrahar was personally involved in the case against Shaun and knew or, in the absence of his deliberate indifference and recklessness, should have known of his subordinates' unconstitutional actions and related misconduct in the case.

174. Furthermore, Defendant Farrahar failed to supervise the BPD Defendants in constitutionally adequate law enforcement practices, particularly those concerning interviews of suspects, payments to witnesses, and the production of exculpatory evidence, thereby encouraging

and/or permitting these employees to engage in a reckless investigation, to fabricate false inculpatory evidence, and to withhold exculpatory and impeachment evidence, which caused the constitutional deprivations suffered by Shaun.

175. These interview techniques, failures in producing exculpatory evidence, fabrications, and other investigative procedures were contrary to accepted methods used by law enforcement agencies. The fact that Defendant Farrahar failed to train and supervise his subordinates to ensure that they employed proper investigation procedures demonstrates deliberate indifference and reckless disregard for Shaun's constitutional rights.

176. Shaun is completely innocent of the shooting and murder of his cousin, Stephen. The prosecution terminated in his favor when the judgment of conviction and sentence were vacated and dismissed.

177. As a direct and proximate result of Defendants' actions, Shaun was wrongly convicted and imprisoned for nearly nineteen years and suffered the other grievous and continuing damages and injuries set forth above.

## COUNT V

### Against the City of Boston

### *Monell* Claim

### 42 U.S.C. § 1983

178. Plaintiff hereby incorporates by reference paragraphs 1–151 and further alleges as follows:

179. Shaun's injuries were caused by the official policies of Defendant City of Boston and the Boston Police Department, by the practices and customs of Defendant City of Boston and the Boston Police Department, as well as by the actions of final policymaking officials for Defendant City of Boston and the Boston Police Department.

180. At all times relevant to the events described in this Complaint and for a period of time prior thereto, Defendant City of Boston promulgated rules, regulations, policies, and procedures governing witness interviews and preparation and presentation of witness testimony, as well as disclosure of investigative materials and evidence.

181. Defendant City of Boston was also responsible for the supervision, training, and discipline of employees and agents of the City of Boston, including employees and agents of the Boston Police Department.

182. These rules, regulations, policies, and procedures were implemented by employees and agents of Defendant City of Boston, including the individual Defendants, who were responsible for conducting investigations of crimes in and around Boston, Massachusetts.

183. In addition, at all times relevant to the events described in this Complaint and for a period of time prior thereto, Defendant City of Boston had notice of a widespread practice by its officers and agents under which individuals suspected of criminal activity, such as Shaun, were routinely deprived of exculpatory evidence, were subjected to criminal proceedings based on false evidence, and were deprived of their liberty without probable cause, such that individuals were routinely implicated in crimes to which they had no connection and for which there was scant evidence to suggest that they were involved.

184. These widespread practices were allowed to flourish because the leaders, supervisors, and policymakers of Defendant City of Boston directly encouraged and were thereby the moving force behind the very type of misconduct at issue by failing to adequately supervise, train, and discipline their officers, agents, and employees who withheld material evidence, fabricated false evidence and witness testimony, and pursued wrongful prosecutions and convictions.

185. The above-described widespread practices, which were so well settled as to constitute the *de facto* policy of the City of Boston, were allowed to exist because municipal policymakers with authority over the same exhibited deliberate indifference to the problem, thereby effectively ratifying it.

186. Shaun's injuries were caused by officers, agents, and employees of the City of Boston and the Boston Police Department, including but not limited to the individually named Defendants, who acted pursuant to the policies, practices, and customs set forth above in engaging in the misconduct described in this Count.

## COUNT VI

**Against Defendants Keeler, Harris, McGoldrick, and Schroeder**

**State-Law Claim – Malicious Prosecution**

187. Plaintiff hereby incorporates by reference paragraphs 1–151 and further alleges as follows:

188. In the manner described above, Defendants, acting as investigators, individually, jointly, or in conspiracy with one another, as well as within the scope of their employment, accused Shaun of criminal activity and exerted influence to initiate and to continue and perpetuate judicial proceedings against Shaun without any probable cause for doing so and in spite of the fact that they knew Shaun was innocent.

189. In so doing, these Defendants caused Shaun to be subjected improperly to judicial proceedings for which there was no probable cause. These judicial proceedings were instituted and continued maliciously, resulting in injury.

190. The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with malice, with reckless indifference to the rights of others, and in total disregard of the truth and Shaun's clear innocence.

191. As a result of Defendants' misconduct described in this Count, Shaun suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

192. On December 22, 2021, the judicial proceedings against Shaun were terminated in his favor, in a manner indicative of his innocence, when the Commonwealth of Massachusetts entered a *nolle prosequi*.

## COUNT VII

### Against Defendants Keeler, Harris, McGoldrick, Schroeder, and Farrahar

### State-Law Claim – Negligence

193. Plaintiff hereby incorporates by reference paragraphs 1–151 and further alleges as follows:

194. Defendants owed Shaun a duty to refrain from framing him for a crime he had not committed and to conduct a legal and thorough investigation of the murder of Stephen that resulted in the accurate identification, arrest, and prosecution of criminal suspects.

195. That included a duty to turn over exculpatory information, and to ensure that all exculpatory information had been disclosed.

196. Defendants were negligent in the exercise of their duties, including but not limited to, failing to produce exculpatory evidence during the investigation and trial of Shaun Jenkins, and in years of post-conviction proceedings.

197. In the manner described more fully above, the actions, omissions, and conduct of Defendants breached their duty.

198. The misconduct described in this Count was objectively unreasonable and was undertaken in total disregard of the truth and Shaun's clear innocence.

199. As a result of Defendants' misconduct described in this Count, Shaun suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

## COUNT VIII

### Against Defendants Farrahar, Harris, Keeler, McGoldrick, and Schroeder

### State-Law Claim – Intentional Infliction of Emotional Distress

200. Plaintiff hereby incorporates by reference paragraphs 1–151 and further alleges as follows:

201. The actions, omissions, and conduct of Defendants as set forth above were extreme and outrageous. These actions were rooted in an abuse of power and authority and were undertaken with the intent to cause, or were in reckless disregard of the probability that their conduct would cause, severe emotional distress to Shaun, as is more fully alleged above.

202. As a direct and proximate result of Defendants' actions, Shaun suffered and continues to suffer physical injury, emotional distress and other grievous and continuing injuries and damages as set forth above.

## COUNT IX

### Against Defendants Farrahar, Harris, Keeler, McGoldrick, and Schroeder

### State-Law Claim – Negligent Infliction of Emotional Distress

203. Plaintiff hereby incorporates by reference paragraphs 1–151 and further alleges as follows:

204. Defendants owed Shaun a duty to refrain from framing him for a crime he had not committed and to conduct a legal and thorough investigation of the murder of Shaun that resulted in the accurate identification, arrest, and prosecution of criminal suspects.

205. In the manner described more fully above, the actions, omissions, and conduct of Defendants breached this duty.

206. The misconduct described in this Count was objectively unreasonable. It was reasonably foreseeable that Defendant's actions would cause any reasonable person, including Shaun, emotional distress.

207. As a direct and proximate result of Defendants' actions, Shaun suffered and continues to suffer physical injury, emotional distress, and other grievous and continuing injuries and damages as set forth above. His distress is manifested in symptoms such as insomnia, deep depression, and anxiety.

**COUNT X**

**Against Defendants Farrahar, Harris, Keeler, McGoldrick, and Schroeder**

**State-Law Claim – Mass. Gen. Laws ch. 12, § 11H**

208. Plaintiff hereby incorporates by reference paragraphs 1–151 and further alleges as follows:

209. Defendants interfered with Shaun's exercise and enjoyment of rights guaranteed to him by the U.S. Constitution and the constitution and laws of the Commonwealth of Massachusetts by fabricating evidence, coercing testimony, and failing to disclose exculpatory evidence.

210.  Defendants' misconduct deprived Shaun of his rights under federal and state law by use of threats, intimidation, and coercion, thereby violating the Massachusetts Civil Rights Act.

211. As a result of Defendants' misconduct described in this Count, Shaun suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

## COUNT XI

### Against Defendants Farrahar, Harris, Keeler, McGoldrick, and Schroeder

### State-Law Claim – Civil Conspiracy

212. Plaintiff hereby incorporates by reference paragraphs 1–151 and further alleges as follows:

213. As described more fully in the preceding paragraphs, Defendants, acting in concert with other co-conspirators, known and unknown, reached an agreement among themselves to frame Shaun for a crime he did not commit and conspired by concerted action to accomplish an unlawful purpose by an unlawful means. In addition, these co-conspirators agreed among themselves to protect one another from liability for depriving Shaun of these rights.

214. In furtherance of their conspiracy, each of these co-conspirators committed overt acts and were otherwise willful participants in joint activity.

215. The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with malice, with reckless indifference to the rights of others, and in total disregard of the truth and Shaun's clear innocence.

216. As a result of Defendants' misconduct described in this Count, Shaun suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

## COUNT XII

### Against City of Boston and Farrahar

### State-Law Claim – *Negligent Training and Supervision*

217. Plaintiff hereby incorporates by reference paragraphs 1–151 and further alleges as follows:

218.  While committing the misconduct alleged in the preceding paragraphs, Defendants were employees, members, and agents of the City of Boston, acting at all relevant times within the scope of their employment.

219. Defendants had a duty to exercise reasonable care in the hiring, retention, and supervision of their employees, all of whom regularly interacted with members of the public.

220. Defendants breached that duty because they were aware or should have become aware of problems with the Homicide Detectives and failed to take further action such as investigating, discharging, or reassigning those detectives.

221. Defendant City of Boston is liable as principal for all torts committed by its agents.

## COUNT XIII

### Against Defendant City of Boston

### State-Law Claim – *Respondeat Superior*

222. Plaintiff hereby incorporates by reference paragraphs 1–151 and further alleges as follows:

223.  While committing the misconduct alleged in the preceding paragraphs, Defendants were employees, members, and agents of the City of Boston, acting at all relevant times within the scope of their employment.

224. Defendant City of Boston is liable as principal for all torts committed by their agents.

### <u>PRAYERS FOR RELIEF</u>

225. WHEREFORE, Plaintiff Shaun Jenkins demands judgment jointly and severally against Defendants as follows:

a.  That the Court award compensatory damages to him and against the Defendants, jointly and severally, in an amount to be determined at trial;

b.  That the Court award punitive damages to him, and against Defendants, in an amount to be determined at trial, that will deter such conduct by Defendants in the future;

c.  For a trial by jury;

d.  For pre-judgment and post-judgment interest and recovery of his costs, including reasonable attorneys' fees pursuant to 42 U.S.C. § 1988 for all 42 U.S.C. § 1983 claims, as well as Mass. Gen. Laws ch. 12, § 11H; and

e.  For any and all other relief to which he may be entitled.

Dated this 8 day of June, 2023.

Respectfully submitted,

By:    /s/ Anna Benvenutti Hoffmann
       Anna Benvenutti Hoffmann (BBO #660595)
       Nick Brustin*
       Owanaemi Briggs*
       Sophia Villarreal*
       NEUFELD SCHECK & BRUSTIN, LLP
       99 Hudson Street, 8th Floor
       New York, New York 10013
       anna@nsbcivilrights.com
       nick@nsbcivilrights.com
       emi@nsbcivilrights.com
       sophia@nsbcivilrights.com
       Phone: (212) 965-9081

By:    /s/ Ana Muñoz
       Emma Quinn-Judge (BBO #664798)
       Monica R. Shah (BBO #664745)
       Ana Muñoz (BBO #569233)
       Zalkind Duncan & Bernstein LLP
       65A Atlantic Ave
       Boston, MA 02110
       equinnjudge@zalkindlaw.com
       mshah@zalkindlaw.com
       amunoz@zalkindlaw.com
       Phone: (617) 742-6020

\* *Pro hac vice* applications forthcoming

*Attorneys for Plaintiff Shaun Jenkins*